Gary MAUPPIN [Garry Mauppins] *v.* STATE of Arkansas

CR 91-107 831 S.W.2d 104

Supreme Court of Arkansas
Opinion delivered May 4, 1992

238

*Killough, Ford & Hunter*, by: *Paul N. Ford*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. Appellant was convicted of

two counts of capital murder and two counts of attempted capital murder. He was sentenced to death by lethal injection on one of the counts of capital murder, life imprisonment without parole on the other count of capital murder, and thirty years imprisonment on each count of attempted capital murder. The four convictions are jointly appealed. We reverse and remand for a new trial.

Appellant, Gary Mauppin, and Kenneth Reed, a convicted felon, were both in the Cross County jail the day before the crimes were committed, and appellant told Reed: "Kenny, I am going to kill me two guys. One of them was named Dolphus Sams and another guy out in a trailer house." Early in the evening of August 10, 1985, appellant and Dolphus Sams were riding in Sams's truck when Sams scolded him for breaking into the house of his former girlfriend, Pat Lloyd. Appellant became angry when Sams scolded him and asked to be taken to his home in Colt. Sams took appellant home, where he remained until about 11 p.m., when he left on foot and found a car with the keys in it. He took the car, drove to his former girlfriend's house in Wynne, looked through a window, and saw her in bed with another man, Rick Stapler. He went to a liquor store, bought a six-pack of beer, went home, and got a .22 caliber rifle and a box of shells. He left his home and drove to the mobile home of Dolphus Sams near Fitzgerald Crossing. He opened the door with a key he had possessed for about four months and, once inside, found Dolphus Sams and Ervin Snyder asleep in separate bedrooms. He went into the living room area and, over a considerable period of time, drank the six-pack of beer plus eight or ten more cans of beer which he found in Sams's refrigerator. Sometime between 2:00 and 3:00 a.m., he put a shell in the chamber of the .22 and went into Sams's bedroom, where Sams was sleeping face down. Appellant put the .22 next to the back of Sams's head and shot him. The shot instantly killed Sams. He took $15.00 from Sams's pocket and went to Snyder's bedroom and shot him in the back of the head. Again, death was instantaneous. He said that the reason he shot Snyder was because he thought Snyder might have seen or heard him shoot Sams. He took $75.00 to $100.00 from the top of a chest-of-drawers that was next to Snyder's bed.

Appellant found the keys to Sams's truck and drove the truck to the home of his former girlfriend, Pat Lloyd. He hid outside her house for about an hour, cut her telephone line, and

then around 3:30 a.m., climbed inside through a window. Pat Lloyd and Rick Stapler, who were on a mattress in the living room, heard him coming through the window. They saw him with the rifle and lay motionless. When appellant went into a bedroom, Rick Stapler ran toward a nearby house to call the police. As he was running he saw a newspaper deliveryman, Billy Neal, and his wife, Betty Neal. He asked one of them to call the police, and Betty Neal made the call. Wynne policeman Donald Hopper and Cross County Deputy Sheriff Jackie Clark immediately responded. They began to search the house and, by his flashlight beam, Deputy Clark saw a foot sticking out from under a bed. He first motioned to Officer Hopper and then commanded the intruder to "Come out." Officer Hopper joined him and said, "Get up from there." Suddenly, the appellant jumped up and started shooting at them. He hit Officer Hopper seven times and Deputy Clark once.

Appellant quickly left and tried to go to an aunt's house but saw a number of police cars around her house so he left there and, at about 6:30 a.m., went to the home of Mary Jane and David Franz. He told them he had gone to Pat Lloyd's house, cut the phone line with wire cutters and, while there, shot three or four policemen, killing at least two of them. He said, before going to Pat Lloyd's house, he had killed Dolphus Sams and another man who was staying at Sams's mobile home. He said he killed Sams and Snyder in self-defense. He tried to give David Franz the wire cutters and did give him a wristwatch that came from Pat Lloyd's home. The Franzes left and called the police.

The police responded and ordered appellant out of the house. He did not come out. They threw tear gas into the house, and Officer Elmer St. Clair rushed inside just in time to see appellant shoot himself in the head with the .22 caliber rifle. The appellant was transported by ambulance to a Memphis hospital where he underwent brain surgery. He was subsequently returned to Wynne and was confined in the Cross County Hospital where, on August 24, 1985, thirteen days after shooting himself in the head, he gave a confession. Expended cartridge cases found at Sams's mobile home and expended cartridge cases found at Lloyd's home were determined to have been ejected from the .22 caliber rifle which Officer St. Clair recovered from the appellant. The watch that appellant gave David Franz was determined to be Rick

Stapler's watch that appellant had taken from Pat Lloyd's house. On August 23, 1985, the appellant was charged with the crimes. Over the next five years there were numerous proceedings involving appellant's mental condition. In October 1990, over five years after the crimes were committed, appellant was tried and convicted.

Appellant makes a number of arguments involving the trial court's orders directing the State Hospital to evaluate his mental condition. In one of the arguments he contends that, under the applicable statutes, the circuit court lost jurisdiction to try him, and therefore, his convictions are void. The factual predicate to his argument is as follows. On September 13, 1985, the circuit court ordered the State Hospital to evaluate the appellant to determine (1) his capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law and (2) whether appellant was aware of the nature of the charges and capable of cooperating effectively with his attorney in the preparation of his defense. On December 10, 1985, Dr. Roy Ragsdill, the Director of Forensic Psychiatry Services of the State Hospital, responded that appellant was unaware of the nature of the charges and the proceedings against him and that he was unable to cooperate with his attorney. On the basis of that report, and the statute then in effect, Ark. Stat. Ann. § 41-607 (Supp. 1985), the circuit court ordered appellant committed to the State Hospital for a period not to exceed one year. Exactly one year later, on December 10, 1986, Ruben Harris, a Staff Physician for the State Hospital reported to the trial court:

> It is my opinion that Mr. Mauppin is still suffering from the mental defect, Dementia Secondary to Trauma to the head with residual aphasia, for which he was found not competent to stand trial for first degree murder in that he still can marginally communicate on any complex thought process and express himself in a limited way using short simple sentences only. His comprehension of what is said to him appears to be even more limited than his expressing himself.

On February 20, 1987, Dr. Ragsdill again gave the trial court a letter of evaluation. In it, Dr. Ragsdill wrote:

> In my opinion, he continues to be unable to appreciate the

charges and proceedings against him in any rational way and unable to assist effectively in the preparation of his own defense due to the neurological residuals of his self-inflicted head wound. He continues to have severe difficulties in comprehending language and in expressing his own thoughts. In my opinion, it is not likely that he is going to improve sufficiently ever to be able to be considered competent to stand trial.

Although the record does not give us the exact date, it was apparently just after this letter that appellant was returned to the Department of Correction as a parole violator to serve the remainder of a prior sentence. On January 25, 1988, while appellant was still in prison, the State asked for a re-evaluation. The trial court immediately ordered another evaluation. For some reason unknown to us, but agreed by the parties not to be the fault of either the State or the appellant, appellant was not taken to the State Hospital for the evaluation. Nine months later, on October 21, 1988, the trial court ordered the Sheriff of Cross County to go to the Department of Correction, get appellant, and take him to the State Hospital for a re-evaluation. On December 13, 1988, David A. Pritchard, a staff psychologist, not a psychiatrist as required by Ark. Code Ann. § 5-2-305, issued the report on behalf of the State Hospital which provided in part:

Diagnosis: Axis I - Dementia secondary to gunshot wound to head, Moderate; Axis II - Deferred; Axis III - Bilateral, mild to profound, sensorineural hearing loss, secondary to gunshot wound to head.

The defendant appears to be unaware of the nature of the charges and the proceedings taken against him. He is not capable of cooperating effectively with an attorney in the preparation of his defense.

At the time of the commission of the alleged offense, the defendant did not lack the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

The report did not state whether the appellant's condition was of a nature that would preclude fitness to proceed at some future date or whether the appellant presented a danger to himself or others.

By March 3, 1989, appellant had been released by the Department of Correction to the custody of the Sheriff of Cross County to be held on the charges filed in this case. The State, on March 3, again moved for another evaluation. The trial court immediately ordered a re-evaluation and commitment for treatment for up to one year. On August 23, 1990, Dr. B. R. Bogost, a staff psychiatrist for the State Hospital, wrote:

> The above patient has now improved from his previously diagnosed psychiatric illness and is now fit to proceed. He is ready to return to Court for disposition. He is able to understand the charges against him and is able to assist his attorney in his defense.

> He is no longer in need of inpatient psychiatric care. However, at the time of the commission of the alleged offense, the defendant did not lack the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law.

> The patient has neurosensory deficit secondary to the gunshot wound to his head sustained in 1985. Close attention should be given to talking to him face to face and with no surrounding noise.

The trial court ordered the case to go to trial on October 1, 1990.

■■ Appellant contends that under the statutes applicable to the above set of facts, the circuit court lost jurisdiction to try him. The argument is without merit. The governing statutes are now codified as Ark. Code Ann. §§ 5-2-301 to -325 (1987), but when the proceedings started in 1985 they were codified as Ark. Stat. Ann. §§ 41-601 to -617 (Repl. 1977). There were only minor changes in the statutes over the five-year period, and they are not material to this case. Generally speaking, the statutes provide for a mental evaluation of the accused by an appropriate mental health facility. Ark. Code Ann. § 5-2-305 (Supp. 1991). The evaluation is to determine the accused's competency (1) at the time of the *crime* and (2) at the time of *trial*. The test at the time of the crime is whether the accused had the capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law. Ark. Code Ann. § 5-2-305(d)(4) (Supp. 1991). The test at the time of trial is whether the accused is aware

of the nature of the charges against him and is capable of cooperating effectively with his attorney in the preparation of his defense. Ark. Code Ann. § 5-2-305(d)(3) (Supp. 1991). When, under the-time-of-the-crime evaluation, the accused is found not to have had the capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law, the trial judge may acquit the accused on the basis of the evaluation. Ark. Code Ann. § 5-2-313 (Supp. 1991). When this is done, the circuit court may commit the accused to an appropriate institution for up to thirty days. After that, the circuit court loses jurisdiction, and jurisdiction for a civil commitment is placed in the probate court. Ark. Code Ann. § 5-2-314 (Supp. 1991); *Stover* v. *Hamilton*, 270 Ark. 310, 604 S.W.2d 934 (1980).

■ Here, the accused was never acquitted by the circuit court, and the circuit court never lost jurisdiction to the probate court. Instead, the issue concerned the accused's competency at the time of trial. From 1985 to 1990, the accused was determined to be unable to cooperate effectively with his attorney in the preparation of his defense. Section 5-2-302 of the Arkansas Code Annotated of 1987 provides that no person who lacks the capacity to understand the proceedings against him or to assist effectively in his defense shall be tried, convicted, or sentenced *so long as such incapacity endures*. Section 5-2-310 provides that if the circuit court determines that the accused lacks fitness to proceed, the proceedings against him shall be *suspended*. Thus, the circuit court never lost jurisdiction.

■■ Appellant next argues that the trial court erred in ordering his re-evaluation for a number of reasons. First, he argues that he was in the State Hospital from December 23, 1985, to February 20, 1987, a period of thirteen months, which is longer than the one-year period that a circuit court can commit a person who lacks fitness to proceed. *See* Ark. Code Ann. § 5-2-310(b)(1) (1987) (now a ten-month period, *see* Ark. Code Ann. § 5-2-310(b)(1) (Supp. 1991)). There are two answers to that argument. First, the circuit court may not commit an accused for longer than one year for "restoration of fitness to proceed." The accused has not shown that the only reason he was in the State Hospital was because of his mental condition. The court orders and petitions, as well as common sense, would lead us to think that it is entirely possible that the commitment had a dual purpose:

mental evaluation and the medical recuperation of a person who had recently shot himself in the head and had brain surgery. Second, even if the commitment might have violated the statute, an illegal detention will not void a subsequent conviction. In a comparable situation involving an illegal arrest, we wrote: "It goes almost without saying that a defendant, after having been fairly tried in a court of competent jurisdiction and found guilty . . . is not entitled to be set free on the basis of some flaw in the manner of his arrest." *Singleton* v. *State*, 256 Ark. 756, 757, 510 S.W.2d 283, 284 (1974). That reasoning is applicable to this case.

Appellant also argues that the trial court erred in sending him back to the State Hospital for re-evaluation because the statutes do not mention re-evaluation. We also reject this argument for two reasons. First, as set out above, we will not void a conviction for a prior illegal detention. Second, the circuit judge interpreted the applicable statute in a common sense manner. The statute provides, in part: "When the court, on its own motion or upon application of the Director of the Department of Human Services, the prosecuting attorney, or the defendant, determines, after a hearing if one is requested, that the defendant has regained fitness to proceed, the criminal proceeding shall be resumed." Ark. Code Ann. § 5-2-310(c) (Supp. 1991). Common sense dictates that the above quoted language contemplates a re-evaluation that later determines whether the defendant has regained fitness to proceed.

In a somewhat related argument appellant argues that the trial court erred in refusing to rule that he would never recover sufficiently to stand trial. The underlying facts are as follows. On January 23, 1989, appellant filed a petition asking that the charges against him be dismissed because he would never be competent to stand trial. He primarily based his petition on the report signed by David Pritchard, a staff psychologist. The trial court denied the petition stating that Dr. Pritchard's report "is not in compliance with Ark. Code Ann. § 5-2-310 . . . in that the letter does not address the issue of fitness to proceed, or whether the defendant is dangerous to himself or the person or property of others." The ruling of the trial court was correct for the reasons given by the trial court.

Appellant argues that the trial court erred in refusing to

grant his motion for a directed verdict. This point of appeal is procedurally without merit. Appellant moved for a directed verdict at the close of the State's case-in-chief, but failed to renew the motion at the close of the case. Therefore, he cannot challenge the sufficiency of the evidence on appeal. A.R.Cr.P. Rule 36.21(b); *Sanders* v. *State*, 305 Ark. 112, 895 S.W.2d 953 (1991).

▪ The first assignment of trial error that we consider involves the trial court's denial of appellant's motion to suppress his confession. Appellant moved to suppress the confession he gave while in custody on the ground that he did not *knowingly and intelligently* waive his Fifth, Sixth, and Fourteenth Amendment rights. The trial court heard evidence on the motion and refused to suppress the statement. A majority of this court, consisting of the Chief Justice and Justices Dudley, Newbern, and Brown agree that ruling was in error. The Supreme Court of the United States, in a series of cases, has set out the applicable principles. In *Miranda* v. *Arizona*, 384 U.S. 436, 467 (1966), the Court recognized that custodial interrogation inherently produces "compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely." To neutralize this inherent compulsion and give true meaning to the Fifth Amendment privilege against self-incrimination, the Court in *Miranda* imposed a clear standard for police to follow in dealing with an accused. Before questioning an accused, the police must fully apprise the suspect of the State's intention to use his statements to secure a conviction and must inform him of his rights to remain silent and to have counsel, if he desires. *Id.* at 468-70. A waiver of these rights is valid only if it is made "voluntarily, knowingly and intelligently." *Id.* at 444. An incriminating statement obtained on the basis of a waiver must be excluded unless the State establishes to the satisfaction of the trial court by a preponderance of the evidence that the waiver was voluntarily, knowingly, and intelligently given. *Colorado* v. *Connelly*, 479 U.S. 157, 168 (1986).

The inquiry into waiver has two distinct dimensions. *Colorado* v. *Spring*, 479 U.S. 564 (1987); *Moran* v. *Burbine*, 475 U.S. 412 (1986). "First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or decep-

tion." *Moran* at 421. "Involuntary confession" jurisprudence is concerned with governmental intimidation, coercion, or deception. *Colorado* v. *Connelly*, 479 U.S. 157 (1986). Such governmental overreaching is not at issue in this case, and we do not discuss it further.

"Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran* at 421. In *Colorado* v. *Spring*, 479 U.S. 564, 574 (1987), the Court wrote:

> The Constitution does not require that a criminal suspect know and understand every possible consequence of a waiver of the Fifth Amendment privilege. *Moran* v. *Burbine, supra*, at 422; *Oregon* v. *Elstad, supra*, at 316-317. The Fifth Amendment's guarantee is both simpler and more fundamental: A defendant may not be compelled to be a witness against himself in any respect. The *Miranda* warnings protect this privilege by ensuring that a suspect knows that he may choose not to talk to law enforcement officers, to talk only with counsel present, or to discontinue talking at any time. The *Miranda* warnings ensure that a waiver of these rights is knowing and intelligent by requiring that the suspect be fully advised of this constitutional privilege, including the critical advice that whatever he chooses to say may be used as evidence against him.

"Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran* at 421 (citing *Fare* v. *Michael C.*, 442 U.S. 707, 725 (1979)). The "totality of the circumstances" appellate review mandates inquiry into an evaluation of "age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare* at 725. Thus, a court must look at the totality of the circumstances to see if the State proved that a defendant had the requisite level of comprehension to waive his Fifth and Sixth Amendment rights.

In this case, the trial judge did not make a finding of fact on the issue of a knowing and intelligent waiver. Instead, he found only that the statement was voluntary. The trial judge stated that he was guided by the case of *Colorado* v. *Connelly, supra,* and held that there was no police "intimidation or coercion or deception" and that the waiver was "voluntarily" given. As previously set out, coercion, or police overreaching, is not the issue before us, and the case of *Colorado* v. *Connelly, supra,* is a case about coercion. In that case, "voices" told the accused to confess, and the Supreme Court held that an accused's hearing of "voices" was not governmental misconduct which would render the statement coerced. The issue of a "knowing and intelligent" waiver was not before the Supreme Court in that case, and its reasoning is inapposite to the case at bar.

At the suppression hearing, in order to prove by a preponderance of the evidence that the waiver was knowingly and intelligently given, the State called only two witnesses, Buddy Early, the Wynne policeman who was the guard outside the appellant's hospital room on the day he gave the confession, and Dave Parkman, the investigator for the Cross County Sheriff's Office who took the confession. Policeman Early was asked if the appellant was given a *Miranda* warning, and he responded that investigator Parkman gave the appellant a written statement advising him of his rights and that appellant signed the statement and initialed each of the six questions on the statement. He was not asked if appellant was allowed to read the statement. He was not asked if appellant was already familiar with his rights. He was not asked if the appellant was allowed sufficient time to read the warning form. He was not asked the interval of time that elapsed between his entry into appellant's hospital room and when appellant signed the form. He was not asked about appellant's age, experience, education, background, intelligence, whether he was under sedation for pain at the time, whether he had the requisite capacity to understand the warnings given him, whether he understood his Fifth Amendment rights, or whether he understood the consequences of waiving those rights. He was asked numerous questions going to the issue of voluntariness, but that is not the issue. In summary, he was not asked questions to prove that the appellant possessed the requisite level of comprehension to waive his constitutional rights.

Investigator Parkman testified that he explained each of appellant's rights to him and that appellant signed the statement of rights form and initialed each question on the form. He testified that the appellant nodded yes to indicate he understood the questions on the form. Investigator Parkman, like officer Early, did not testify about appellant's age, experience, education, background, intelligence, whether he had the capacity to understand the warnings, or whether he had the capacity to understand his Fifth Amendment rights and the consequences of waiving those rights. Investigator Parkman testified that appellant appeared to be in critical condition immediately after he shot himself, that he was taken to a hospital in Memphis where he had brain surgery, and that appellant had just been returned to the Cross County Hospital when he gave the statement. He admitted that appellant could not speak, but could only communicate by motions and writing, and that Parkman, not appellant, wrote the statement. He was not asked, and did not testify whether appellant had been, or still was, under sedation or medication. Investigator Parkman answered numerous questions going to the voluntariness of the confession. It is significant that the State did not offer the testimony of any nurses, aides, doctors, or visitors from the hospital in Memphis, the Cross County Hospital, or the State Hospital.

While the State did not put on evidence going to the level of appellant's comprehension, appellant put in evidence the reports from the State Hospital which went directly to the issue. On December 10, 1985, just a little over three months after the confession, Dr. Roy Ragsdill found the appellant was unaware of the nature of the charges and proceedings against him and unable to cooperate with his attorneys. The other reports, quoted in an earlier part of this opinion, indicate that this mental condition continued for almost four years. His "aftercare plan" in 1989 states, "[P]atient does have a hearing loss and wears a hearing aid. He can understand conversation if spoken to slowly and directly face-to-face. Patient will require medication management and supportive therapy while incarcerated pending disposition of his charges."

The waiver of rights form initialed by the appellant and signed by him is also significant. Appellant's initials on the form are printed with an unsteady hand, and the signature is also

printed with an unsteady hand. In contrast, at an earlier hearing on October 17, 1989, the State introduced five letters and one card written by appellant. The State offered these to show that appellant was capable of going to trial. They are dated from November 8, 1985, or shortly after the crimes, to February 11, 1988. They reflect a steady and fluid penmanship, wholly unlike the initials on the form.

The totality of the circumstances reflects that the accused shot himself in the head on August 11, 1985. He was thereafter taken to a hospital in Memphis, had brain surgery, and was returned to the Cross County Hospital where, on August 24, 1985, just thirteen days after the gunshot wound and an unknown number of days after surgery, he gave the confession. The record does not reflect whether appellant was under medication for pain, nor does it reflect his level of intelligence, experience, or comprehension of his constitutional rights. The only direct evidence relating to his level of comprehension is the evidence from the State Hospital which indicated that appellant was unaware of the nature of the charges and proceedings against him. If he was unaware of the nature of the charges and proceedings, it would be most difficult for him to appreciate and understand his rights and to knowingly and intelligently waive them. Thus, upon our review of the totality of the circumstances, we hold that the State did not show that the waiver was made with a full awareness of both the nature of the rights being abandoned and the consequences of the decision to abandon them. Accordingly, we reverse on this point.

Appellant asked the trial court to give AMI Criminal 4005.1, the instruction that outlines the defense of voluntary intoxication. The trial court refused to give the instruction, and that ruling was in error.

At common law, evidence of voluntary intoxication could be admitted to show the accused was incapable of forming the specific intent to commit a crime. In 1976, in the then new criminal code, the General Assembly provided that "self-induced intoxication is an affirmative defense to a prosecution if it negates the existence of a purposeful or knowing mental state." Ark. Stat. Ann. § 41-207 (1976). In 1977, by Act 101 of 1977, the General Assembly removed self-induced intoxication as a statutory defense. As a result, we held that when the legislature removed the

*statutory* affirmative defense, there was no longer any statutory law on the subject, and the *common law* on the subject was reinstated. *Varnedare* v. *State*, 264 Ark. 596, 573 S.W.2d 57 (1978). Thus, from 1978 until it was overruled, *Varnedare* was the law in this State. The crimes at issue in this case occurred in 1985. In 1986, we overruled *Varnedare* in the case of *White* v. *State*, 290 Ark. 130, 717 S.W.2d 784 (1986), and held that the General Assembly had previously intended to completely elimi-nate self-induced intoxication as a defense and had not intended to reapply the common law to the subject.

The crimes in this case were committed on August 11, 1985, when *Varnedare* was still the law. At the time of these crimes, our substantive law recognized the common law defense of voluntary intoxication to specific intent crimes. The ruling of the trial court applied *White* to retroactively abolish the justifica-tion defense, and in so doing, eliminated a defense that was available at the time of the offense. This was in error. The same conduct that would have gone unpunished under the defense made available in *Varnadere*, would result in a conviction after *White*. An accused is entitled to any defense that existed at the time of the commission of the crime, even if that defense was based only on a court's erroneous interpretation of the law. *James* v. *United States*, 366 U.S. 213 (1960).

Such a holding is based on the judicial corollary of the prohibition of ex post facto laws. "Ex post facto" literally means a law passed after the fact. That is, after the occurrence of the fact, or the crime. The constitutional prohibition on ex post facto laws is a limitation upon the powers of the legislature and does not of its own force apply to the judicial branch. However, the principle on which the clause is based, the notion that persons have a right to fair warning of that conduct which will give rise to criminal penalties, is fundamental to our concept of constitutional liberty, and as such, is protected against judicial action by the due process clause of the Fifth Amendment. *Marks* v. *United States*, 430 U.S. 188 (1977). Accordingly, the Supreme Court held that an unforeseen judicial enlargement of a criminal statute, applied retrospectively, operates precisely like an ex post facto law that is prohibited by Article I, § 10 of the Constitution of the United States, and it follows that such an interpretation is barred by the due process clause of the Fourteenth Amendment from achieving

precisely the same result by judicial construction. The fundamental principle is that the required *criminal law must have existed when the crime occurred. Collins* v. *Youngblood*, 110 S. Ct. 2715 (1990).

 Appellant makes numerous other assignments of trial error, but none have merit. We address only those which might arise upon retrial. Appellant argues that the death penalty is cruel and unusual punishment in violation of the Eighth Amendment. This issue has been decided adversely to appellant's position. *Gregg* v. *Georgia*, 428 U.S. 153 (1976); *Pickens* v. *State*, 292 Ark. 362, 730 S.W.2d 230 (1987), *cert. denied*, 484 U.S. 917 (1987). He argues that the Arkansas death penalty statute, Ark. Code Ann. § 5-4-603 (1987), is unconstitutional because it mandates death. We have often rejected this contention, *Pickens* v. *State, supra*, and most recently did so in *Johnson* v. *State*, 308 Ark. 7, 823 S.W.2d 800 (1992). He argues that the trial court erred in allowing death qualification of the jury. The Supreme Court of the United States and this court have both rejected this argument. *Lockhart* v. *McCree*, 476 U.S. 162 (1986); *Van Pelt* v. *State*, 306 Ark. 624, 816 S.W.2d 607 (1991). Appellant argues that the statutory aggravating circumstances for the death penalty are unconstitutional because they are vague and over-broad. We rejected this argument in *Ruiz* v. *State*, 299 Ark. 144, 772 S.W.2d 297 (1989). He argues that the capital murder statute is unconstitutional because it overlaps the first degree murder statute. We have also rejected this argument. *See Smith* v. *State*, 306 Ark. 483, 815 S.W.2d 922 (1991).

 Additionally, appellant argues the trial court abused its discretion in denying his motion for a change of venue. We have repeatedly emphasized the significance of the trial court's observation of the witnesses on these motions, and we cannot say the trial court abused its discretion in this case. *See Gardner* v. *State*, 296 Ark. 41, 754 S.W.2d 518 (1988). He argues that the trial court erred in not ordering funds for a private psychiatrist. We have rejected this argument. *See Branscomb* v. *State*, 299 Ark. 482, 774 S.W.2d 426 (1989). Finally, he argues that the trial court erred in allowing a number of exhibits into evidence because of an alleged break in the chain of custody. We cannot say the trial court erred in its ruling. *See Neal* v. *State*, 298 Ark. 565, 769 S.W.2d 414 (1989). Appellant makes other

assignments of error that we do not address as they are not likely to arise again upon retrial.

Appellant has not complied with the requirement of Rule 11 (f) of the Rules of the Supreme Court and Court of Appeals by abstracting all objections decided adversely to him in this death sentence case. The Attorney General stated that he did so but, in fact, he did not. Despite these failures to comply with the rule, we have chosen not to order that the case be rebriefed because that would cause another delay in a case that is already seven years old.

Reversed and remanded for a new trial.

HAYS, GLAZE, and CORBIN, JJ., dissent.

TOM GLAZE, Justice, dissenting in part. I strongly disagree with the majority decision that Gary Mauppin did not understand his rights and knowingly and intelligently waive them. Basically, the majority court must disbelieve the testimony of Officers Dave Parkman and Buddy Early to reach that conclusion, and such a call on credibility of witnesses is not this court's function. These officers' testimony was replete with how Mauppin voluntarily and knowingly responded to questions reflecting the details of how he chillingly killed two men during their sleep.

The officers related that Mauppin could not talk, but he answered questions by writing notes, nodding his head, using his hands and demonstrating how the victims were positioned in their beds when he shot them. The officers employed crime scene diagrams which Mauppin used to show where the victims and certain items were located in the bedrooms. Parkman testified on this point as follows:

> His [Mauppin's] responses were accurate. The nod of the head, agree or disagree, corrections in some things that we asked him, the physical facts that backed up what Mr. Mauppin responded to, which were accurate. I don't believe we found one place on our diagrams where Mr. Mauppin was inaccurate. What he pointed out was always accurate as to what the questions were toward him and that's why I say he understood very well what we were talking about.

Both officers testified that Mauppin disagreed on some sets of facts presented him. In this respect, Parkman related the following:

> Yes, sir. I remember on two different occasions, I remember recalling an instance where Mr. Mauppin was arrested and where he had went to that morning after these shootings and there was a table beside a bed in the bedroom where Mr. Mauppin had been laying. There was some cigarettes and a lighter on that table. I asked Mr. Mauppin about a pack of cigarettes and a lighter on that table and he corrected me as two packs of cigarettes and we did verify the fact that there were two packs of cigarettes on that table instead of one. I recall that incident and then he corrected me on a time element. I don't recall exactly where it was. I believe it was the time he spent in Dolphus Sams trailer. I believe there was a correction there. We thought the time was shorter as to the time he had spent in the trailer and he corrected us in that. I believe that's the time element I'm talking about.

Officer Early testified that he was guarding Mauppin in the hospital when Mauppin wrote a note requesting Parkman's presence. Early was in Mauppin's room when Parkman spoke with Mauppin. Mauppin was sitting on the corner of his hospital bed. Early confirmed that Mauppin understood his rights and initialed each one. The majority refers to Mauppin's unsteady hand when initialing the rights form, but Mauppin, who was left-handed, used his right hand in initialing the form. On this point, the majority opinion refers to letters and a card which were later written in a steady and fluid penmanship. They were letters written to family members. One letter, in fact, was written only two months after his confession and during the time he purportedly was unaware of the nature of the charges against him. Yet, excerpts from that letter, written in very good penmanship, and others were read and summarized by the prosecutor, without objection, as follows:

> "August 11, 1985 - I shot myself. There is a hole in my head about two inches by two inches. The doc told me wouldn't live long. I have a twelve year old brain and can't talk and can't remember nothing. Don't know why at all.

August 26, 1985 - In prison diagnostic unit. Stayed there 37 days. Man give me test and told me I had a nine to twelve year old brain. Went to Cummins October 1 and I was in Barracks 19. Had job in laundry. Worked one day and then locked me down in 16 building." It goes on to tell about birthdays. It goes on talking about how many letters he received from each of his children. It says here in this same letter in November of 1985 - "Diane one letter, Mom and Dad five to seven letters. They don't send me no money and it rough to get by on. I been there three months. Nobody ever show up. The reason Pat Lloyd cause all of it. That bitch." So, he goes on to show hostility towards individuals. He asks questions of how members of his family are. He wrote a letter on him birthday, July 4, 1986, that's twenty-seven pages long. It's been introduced into evidence here. It's asking his girls if they want him to build things like this Exhibit No. 3 that's already been introduced and for them to write down what they want on it. He draws pictures one every page and asks them how they like his artwork. He goes into what he does during the day from 9:30 to 10:00, it tells what he did then. That he laid down, that he wrote, that he went to the visitors hours. He watched Price is Right. He goes into great detail of everything he's done.

Besides the foregoing passages, other letters exhibiting Mauppin's reasoning powers were displayed to the trial judge. Aside from grammatical errors, Mauppin's correspondence reflects a man with communicative skills, and the letters support Officer Parkman's and Early's assertion that Mauppin had the capability to intelligently and knowingly waive his rights before having given his confession.

The majority points out that the trial court failed to make a finding on the issue of a knowing and intelligent waiver, but both the prosecutor and Mauppin's counsel discussed these terms repeatedly when arguing Mauppin's motion to suppress.[1] Appellant does not contend on appeal that the trial court failed to

---

[1] Mauppin's motion to suppress alleged he was unable to make a knowing and intelligent waiver of his right to counsel and to make a voluntary statement.

consider this "knowing and intelligent waiver" issue when ruling on his motion, and I suspect even he will be surprised with this aspect of the majority opinion. One has to ignore a substantial part of the record to assume the trial court did not have these elements in mind when it overruled Mauppin's motion. Nevertheless, I believe the record reflects the "totality of the circumstances" supports the view Mauppin intelligently and knowingly waived his rights before giving his confession. The majority simply disregards Officer Parkman's and Early's testimony and Mauppin's own handwriting in order to reach a contrary conclusion. And because I am also of the view that the trial court ruled on Mauppin's entire motion, including the elements of a knowing and intelligent waiver, I conclude the court was not clearly erroneous.

The prosecutor contended Mauppin feigned an inability to understand his rights, and produced convincing evidence to support his contention. At most, conflicting evidence was presented bearing on this issue, and I believe the majority court is wrong in holding Mauppin did not have the knowledge and intelligence to waive his rights. Again, in doing so, the majority not only discredits entirely the officers' testimony, but also it ignores Mauppin's own penmanship which, in my view, conclusively shows he had the ability to communicate very well.

I would not reverse this case on the voluntary and knowing issue relied upon by the majority court. Therefore, I dissent.

HAYS and CORBIN, JJ., join this dissent.