Rammie Earl HALL *v.* STATE of Arkansas

CR 93-398                                        868 S.W.2d 453

Supreme Court of Arkansas
Opinion delivered December 20, 1993
[Rehearing denied January 24, 1994.]

*Murrey L. Grider*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

TOM GLAZE, Justice. Appellant Rammie Hall was convicted for the capital murder of George DeClerk, and sentenced to life without parole. He raises nine points for reversal. We find none of them have merit.

Hall first argues the trial court erred in failing to grant his directed verdict. Hall's conviction was based upon circumstantial evidence which he claims fails to link him to the murder scene or show premeditation or deliberation, and at most only proves he committed the crimes of theft or breaking or entering.

In addressing Hall's first argument the standards of review are well-settled that the court looks to determine whether substantial evidence exists to support the verdict and that circumstantial evidence may constitute substantial evidence. *Tisdale* v. *State*, 311 Ark. 220, 843 S.W.2d 803 (1992); *Sheridan* v. *State*, 313 Ark. 23, 852 S.W.2d 772 (1993). Substantial evidence is forceful enough to compel a conclusion one way or the other beyond suspicion or conjecture, and in determining the sufficiency of the evidence, this court need only ascertain that evidence most favorable to appellee; it is permissible to consider only that testimony which supports the verdict of guilty. *Owens* v. *State*, 313 Ark. 520, 856 S.W.2d 288 (1993). We now review that evidence to support Hall's guilty verdict.

The state presented evidence that Hall knew DeClerk, and was on DeClerk's ranch in Randolph County, Arkansas on December 5 or 6 of 1990, where he was able to obtain one of DeClerk's

business checks which Hall promptly forged and cashed at a local grocery store.[1] On December 7th, Hall returned to Sallisaw, Oklahoma where he resided and told his girlfriend he had found a black extended-cab Chevrolet truck that he wanted. On December 12, 1990, Hall, driving his 1976 blue Oldsmobile, returned to Randolph County where and when he took the necessary steps to steal DeClerk's extended-cab black truck. Without explanation, DeClerk disappeared from sight this same day even though two friends had made their respective plans to see him on December 13th and 14th. One friend, Patricia Reynolds, testified she had gone to DeClerk's ranch on the 14th and found a strange padlock on the entrance gate; the house was locked and dark inside.

On December 13th, Hall was seen with DeClerk's truck, trailer and other property in White County. On that same date, he traded DeClerk's trailer and two horses for a gooseneck trailer. In disposing of DeClerk's property, Hall identified himself as DeClerk. On the 13th, Hall also appeared at a bank in Beebe, and made a $2,200 cash withdrawal using DeClerk's credit card; he also purchased a saddle and two lariat ropes with DeClerk's credit card, signing DeClerk's name. It was also December 13th when Hall called a salvage owner in Randolph County asking him to tow Hall's Oldsmobile which he had left parked on a road about two-tenths of a mile from DeClerk's ranch. Hall gave Grissom the Oldsmobile for the $35.00 towing charge.

Hall returned to Oklahoma late afternoon of December 13th, when he was seen with DeClerk's black pickup and the gooseneck trailer he had acquired. On December 15th, he moved his girlfriend and her sister to Colorado, and three days later, Hall sold the trailer and traded DeClerk's pickup for a Ford pickup. Hall's girlfriend said that Hall disappeared on December 19th.

DeClerk's body was found on December 28, 1990, in his house under a pile of clothes. An autopsy dated January 2, 1991, revealed DeClerk had been shot in the head, and because of the decomposition of the body, the doctor reported DeClerk had been dead for several weeks, placing his death on or about December

---

[1]The check was made payable to R. C. Johnson and purportedly signed by DeClerk. A documents examiner opined Hall signed DeClerk's name.

12, 1990. The autopsy report reflected DeClerk was last seen alive on December 12th. When DeClerk's body was found, it also was learned that his truck, trailer, horses, saddles and other property were missing. Those items were later discovered to be the ones Hall had stolen on December 12 and later sold or exchanged.

An Arkansas fugitive warrant was issued for Hall which eventually resulted in his arrest. On May 29, 1991, Hall was located in Henderson, Nevada where he was stopped for a traffic offense; he identified himself to the officer as William Charles Thomas. The officer subsequently learned Hall's real identity and Hall was returned to Arkansas. Ann Martin, who dated Hall at the time of his arrest, quoted Hall, after his arrest, as saying, "[T]hey couldn't have anything on him about anyone's death [because] . . . they don't even have a gun." Martin said that she had not told Hall that the Arkansas authorities did not have the murder weapon and that she had not given him news clippings that related that information. Hall also told Martin that he had never been in Arkansas, that he was from Texas, and that they had picked up the wrong person.

From the above, it is readily apparent that Hall previously knew DeClerk, made plans to steal his pickup truck and other personal property items and returned to Arkansas to carry out those plans on December 12, 1990 — the same day DeClerk was killed. The next day he tried to cover up his presence at DeClerk's home by calling someone to tow his car away from the place he had left it, two-tenths of a mile from DeClerk's driveway. That same day, Hall proceeded to dispose of DeClerk's property which Hall had stolen. Besides falsely identifying himself as DeClerk and by other aliases when disposing of the stolen property, Hall offered other statements that were clearly falsehoods, or at best, improbable statements explaining suspicious circumstances. Such statements are admissible as proof of guilt. *Bennett* v. *State*, 297 Ark. 115, 759 S.W.2d 799 (1988). In addition to the inconsistent statements already discussed, Hall testified that, on December 12, 1990, he had bought DeClerk's truck, trailer, horses and other items for $6,300 from a man named Jim Bradley and that Hall's Oldsmobile was given to Bradley as a part of the transaction. Hall did not offer Bradley as a witness at trial and the only Jim Bradley found by the state

to live in the county testified that he did not know Hall. Hall used this story in an attempt to explain that he found DeClerk's billfold and credit cards in DeClerk's truck. However, Hall's story failed to mention or explain his Oldsmobile's presence near the DeClerk ranch on December 13th or his request to have it towed.

We conclude the evidence, albeit circumstantial, was more than sufficient to support the state's case that Hall's scheme commenced on his December 6, 1990 trip to Randolph County when he saw DeClerk's truck and used DeClerk's business check to obtain money at a nearby grocery store. The jury could have with reasonable and material certainty believed that when Hall returned to DeClerk's ranch on December 12, 1990, it was necessary for Hall to shoot DeClerk in order to take DeClerk's many possessions described hereinabove, including his personal billfold and credit cards; Hall then locked the entrance gate to the farm and had his car towed to delay anyone finding DeClerk and to coverup Hall's presence in the area. Hall's further use of DeClerk's name when disposing of the stolen property, if believed by those duped into trading for or buying such property, merely was designed to foster the false belief that DeClerk was still alive after December 12th and the 13th, when Hall was seen again in Oklahoma. Accordingly, we hold that the trial court ruled correctly in denying Hall's directed verdict motion.

Hall's second argument is the trial court erred in refusing to prevent the prosecutor from discussing the definition of reasonable doubt with jurors on voir dire. The prosecutor on voir dire voiced the state must prove Hall guilty beyond a reasonable doubt, but wanted assurance that jurors would not require more. He explained the phrase "shadow of doubt" was not law and attempted to explain "reasonable doubt" by examples. For instance, the prosecutor informed a juror that the law did not require them to be one hundred percent certain in order to render a guilty verdict. He illustrated that, if five people saw an event occur and five others said it did not, the juror would have to decide who was telling the truth but the jury might still make a determination of guilt. Hall argues that the state's attempt to quantify reasonable doubt was improper.

In reading the voir dire, we find the trial court inject-

ed itself by quoting the AMCI definition of reasonable doubt and asking one juror in the hearing of the others, if she would listen and follow the court's instructions on burden of proof. The juror said she would. The trial judge also submitted the same AMCI instruction to the jury at the close of the case.[2] In sum, the jury was instructed on the proper burden of proof, and it is presumed to have followed the court's instruction. The course and conduct of voir dire examination of the veniremen is primarily within the trial judge's discretion and Hall fails to show that the judge abused it. *Williams* v. *State*, 274 Ark. 9, 621 S.W.2d 686 (1981).

Hall's third point urges the trial court erred in permitting the state to introduce evidence of another crime. Specifically, he argues the state should not have been able to introduce evidence bearing on the check he forged and passed to the grocery store near DeClerk's ranch on December 6. He claims this evidence merely portrayed him as a bad character and was more prejudicial than probative. The December 6th event, however, showed when Hall first manifested his intent to steal from DeClerk, and it reflected his ability to access DeClerk's checks. Clearly, Hall's actions show when his plan commenced which involved a scheme to use DeClerk's name for pecuniary gain and negated his defense that he had acquired certain items owned by DeClerk by mistake. *See* A.R.E. Rule 404(b). The probative value of the state's evidence went to plan, identity and absence of mistake, and we cannot say the trial judge abused his wide discretion in deciding that the probative value outweighed any danger of unfair prejudice. *Carter* v. *State*, 295 Ark. 218, 748 S.W.2d 127 (1988).

Next, Hall contends he was entitled to a new trial based upon newly discovered evidence. At a post-trial hearing on his motion for a new trial, Hall offered the testimony of Fenton Baltz. Hall argues this testimony would have supported the testimonies of Theron Rice and Dick Thielemier that DeClerk was seen alive on December 13, thus offering an alternate theory that DeClerk was killed after his property was stolen and after

[2]Hall does not challenge the AMCI reasonable doubt definition instruction and the facts here do not warrant a discussion of the court's decision in *Cage* v. *Louisiana*, 498 U.S.39 (1990).

Hall had returned to Oklahoma.[3] Hall points out the testimony given by Baltz that he thought he had last seen DeClerk on a Wednesday which Baltz believed was December 13th. When confronted with the fact that the Wednesday in question was the 12th, Baltz agreed he saw DeClerk last on December 12th.

■ In referring to Baltz's statement, Hall fails to show this statement could not have been discovered or produced at trial, and therefore qualify as newly discovered evidence under ARCP Rule 59(a)(7). In addition, Baltz's testimony merely reflected that he misspoke in stating he never saw DeClerk after December 13th.

■ Hall's fifth point involves a defense witness, Robbie Baltz, who would have testified that a Barry Thompson said that a man named Arlet Humes bragged to a boy named Grimsley that Humes and another man had killed or beat up DeClerk and took his truck. The trial court denied this proffered testimony as double hearsay. The trial court, of course, was right that hearsay is inadmissible except as provided by law or by these rules. A.R.E. Rule 802. Hall offered Baltz's statement to show Humes and another had killed DeClerk, and in doing so, clearly qualified as hearsay which is defined as a statement, other than one made by the declarant while testifying at the trial or hearing, and offered in evidence to prove the truth of the matter asserted. A.R.E. Rule 801(c). Hall never attempted to offer any authority by which Baltz's hearsay testimony should be excepted and admitted. Accordingly, the trial court properly excluded Baltz from testifying.

■ In point six, Hall says that, in the White County Circuit Court, he had pled guilty to a theft of property charge involving his withdrawal of $2,200 in funds from a bank in Beebe by

---

[3]Hall mistakenly cites the testimonies of Rice and Thielemier as supporting his theory. At trial, Rice testified that he last saw DeClerk on December 12 and never saw him from December 13 onward. Thielemier testified that he gave a statement to an Officer Sammons, but he did not remember citing a date in the statement. Further, Thielemier testified he did not recall the date on which he last saw DeClerk. The statement taken by Officer Sammons from Thielemier on the date DeClerk's body was found was read to the jury and states, "Mr. Thielemier says the last time he saw Mr. DeClerk was possibly around December 13, 1990." This evidence hardly supports Hall's contention that DeClerk was still alive on December 13.

using DeClerk's credit card. Citing *State* v. *Thornton*, 306 Ark. 402, 815 S.W.2d 386 (1991), he argues the state should have been prohibited from utilizing the same conduct or elements contained in the White county case to convict him later in this Randolph County case. *See also Craig* v. *State*, 314 Ark. 585, 863 S.W.2d 825 (1993). The *Thornton* and *Craig* cases discuss the Blockburger test for double jeopardy which in pertinent part provides that if the offenses have identical statutory elements or if one is a lesser included offense of the other, then the inquiry must cease, and the subsequent prosecution is barred. Such is not the situation here.

In this Randolph County case, the state charged Hall with capital murder and also included a class B felony theft count that Hall knowingly took or exercised unauthorized control over, or made an unauthorized transfer of an interest in DeClerk's property with the purpose of depriving DeClerk of his property, which is valued over $2,500. DeClerk's truck, trailer, horses and other items taken by Hall were clearly shown to exceed a value of $2,500. In the White County case, the state charged Hall with the separate class C felony theft crime where Hall without authorization used DeClerk's credit card to obtain $2,200 in cash at a bank in Beebe.[4] In short, the White County conviction which Hall offers as a bar to the Randolph County conviction involved separate conduct and a separate crime which took place in White County.

Hall's seventh point for reversal urges the trial court should have inquired of the prospective jurors of their views on the death penalty rather than allowing the state to do so. Of course, the Supreme Court, as well as our court, has allowed the death qualification of the jury. *See Lockhart* v. *McCree*, 476 U.S. 162 (1986); *Mauppin* v. *State*, 309 Ark. 235, 831 S.W.2d 104 (1992). We are unaware of any authority that mandates a trial court to death-qualify potential jurors and Hall cites none.

Hall next claims the trial court erred in permitting the prosecutor to inquire of a juror if the juror understood Hall had the same power to subpoena witnesses as did the state. Hall

---

[4]The White County charge also included a theft by receiving crime, but Hall did not plead in that case and instead that charge was continued.

objected on the basis that the prosecutor's question implied Hall was compelled to call witnesses and put on a defense. While such a comment might have been prejudicial out of context, here, Hall testified and called a number of witnesses in his defense. He simply fails to show how he was prejudiced.

Hall's final argument bears on the request he made to the trial court to permit him to introduce a page of a letter written by the prosecutor to the sheriff's office prior to charges having been filed against Hall. In the letter, the prosecutor asked a deputy sheriff to write a letter detailing the information the officer felt justified a charge of capital murder rather than a charge against him merely for taking the victim's property. The letter further provided the prosecutor would file the capital murder charge once evidence was presented justifying it and concluded by saying, "Hopefully Hall will be arrested by the FBI on the fugitive warrant and evidence of capital murder will be developed."

The trial court excluded the prosecutor's letter because it was the state's work product. The main reason for rejecting the introduction of such a letter is that it is the duty of either a grand jury or prosecutor to charge an accused with a felony. *See* Ark. Const. Amend. 21, § 1; *State* v. *Brooks*, 301 Ark. 257, 783 S.W.2d 368 (1990). Here, the prosecutor eventually brought the capital murder charge against Hall and offered substantial evidence supporting that charge. To allow as evidence one page of a state prosecutor's letter to show the state had no proof to bring a capital murder charge against Hall would have been woefully inaccurate and misleading. The trial court did not abuse its discretion when denying the letter's introduction into evidence.

In conclusion, we add that the record in this case has been examined in accordance with Rule 4-3(h), and it has been determined that there were no rulings adverse to the appellant which constituted prejudicial error.

Affirmed.

HOLT, C.J. and BROWN, J. dissent.

ROBERT L. BROWN, Justice, dissenting. What was proved in

this case was that Rammie E. Hall was a thief and a liar. No substantial evidence was presented that he was a murderer. I would reverse this conviction.

Sam DeClerk, the victim, lived on an isolated ranch in Randolph County. He was something of a recluse, and it was not unusual for him not to be seen for weeks. No one saw him between the night of December 12, 1990, and the day his body was discovered in bed on December 28, 1990. No murder weapon was found. No physical evidence of Hall's presence was found at the crime scene. DeClerk's guns were missing but the stolen guns have not been located and have never been tied to Hall.

An autopsy was performed on January 2, 1991 — three weeks after December 12, 1990, the assumed date of death — and Dr. Violette Hnillica testified that she could not pinpoint the date of death. What follows is cross-examination by the defense:

Q: From your medical findings in the autopsy, were you able to give a specific date as to when this person was killed?

A: No, not at all.

Q: And as far as whether he was killed, for medical purposes, on December 12 or the 13th or the 14th, is there anyway you could determine the date of death?

A: I wouldn't be able to determine that.

Q: Is there any way for medical purposes for you to be able to determine the approximate time in the daytime or . . .

A: No, sir.

On redirect, she added that her findings were consistent with a December 12, 1990 date of death, but on recross, she again admitted that she could not pinpoint date of death other than to say that the victim had been dead a long time and that her "estimate" was even longer than December 12, 1990.

Date of death is, therefore, uncertain.

For circumstantial evidence to constitute substantial evidence, it must exclude every other reasonable hypothesis incon-

sistent with the guilt of Hall. *Green* v. *State*, 313 Ark. 87, 852 S.W.2d 110 (1993); *Chism* v. *State*, 312 Ark. 559, 853 S.W.2d 255 (1993). Ordinarily, that is for the factfinder to resolve. *Boone* v. *State*, 282 Ark. 274, 668 S.W.2d 17 (1984). Our responsibility is to decide whether the jury resorted to speculation and conjecture in reaching its verdict. *Id.*

We have recently affirmed murder convictions or declared error based on circumstantial evidence but in each case there was more proof than exists in the instant case. *See Owens* v. *State*, 313 Ark. 520, 856 S.W.2d 288 (1993) (Defendant was at the rest stop soliciting sex from truck drivers the night of the murder and was seen the next morning with lacerations on her arm, back, and neck. She told a friend that she had stabbed a truck driver and a bloody knife was found in the area.); *Walker* v. *State*, 313 Ark. 478, 855 S.W.2d 932 (1993) (Defendant was present at the shooting and claimed that the victim's death was a suicide. The medical examiner testified that it was not a contact wound and that the manner of death indicated murder.); *State* v. *Long*, 311 Ark. 248, 844 S.W.2d 302 (1992) (Victim was struck by a vehicle and her hair was found on the defendant's car.); *Hill* v. *State*, 299 Ark. 327, 773 S.W.2d 424 (1989) (Defendant was seen fleeing from the area in what could have been minutes after victim's death and possessed stolen property from the victim's home.); *Ferguson* v. *State*, 298 Ark. 600, 769 S.W.2d 418 (1989) (Defendant and an accomplice were seen behind the victim's apartment on the night she was killed and then fled to Kansas City. He later confessed to burglary and stated that the accomplice killed the victim.)

Proof of theft should not equate to proof of murder. A verdict based on the evidence offered can only be conjectural. I respectfully dissent.

HOLT, C.J., joins.