Dale Edward BRYANT v. STATE of Arkansas

CR 93-247                                    862 S.W.2d 215

Supreme Court of Arkansas
Opinion delivered September 13, 1993
[Rehearing denied October 18, 1993.]

132

*Richard R. Parker*, for appellant.

*Winston Bryant*, Att'y Gen., by: *J. Brent Standridge*, Asst. Att'y Gen., for appellee.

ROBERT H. DUDLEY, Justice. Appellant was charged with capital murder. He filed motions to suppress the five incriminating statements he had made to the police. The trial court denied the motions. The result was that the statements

could be introduced into evidence at trial. Appellant then entered a plea of guilty to the charge of capital murder, but the plea was conditioned upon this appeal of the trial court's denial of his motions to suppress the evidence. *See* A.R.Cr.P. Rule 24.3(b). The trial court sentenced appellant to a term of life without parole, and he now appeals from the rulings on the suppression motions. We uphold the rulings of the trial court. In addition, since this case involves a sentence of life in prison, we must review the record of the trial proceedings for any rulings which were adverse to appellant and which might constitute prejudicial error. Ark. Sup. Ct. R. 4-3(h). Because of the procedure in this case, appellant's conditional plea of guilty constituted his trial, and there were no rulings adverse to appellant in that trial other than the rulings involving the suppression motions. Since the trial court's rulings on those motions are upheld, appellant's guilty plea cannot be withdrawn, and he is without any further direct appeal. He must spend the remainder of his life in the penitentiary without possibility of parole.

The facts necessary to understand the evidentiary rulings on appeal, stated from the view most favorable to the appellee, are as follows. The corpse of a murder victim was found near Harrison on January 26, 1992. After a thorough investigation, the police established appellant as the primary suspect. They additionally found that appellant had multiple prior felony convictions in different states with some of the convictions involving violence as well as escape. Accordingly, the police sent out a bulletin that appellant was wanted for homicide and that he should be considered armed and dangerous. Shortly thereafter, on February 4, appellant telephoned Glenn Redding, the Patrol Commander of the Harrison Police Department, and said, "I hear you are looking for me." Redding replied that appellant was being sought for capital murder, and that, because the bulletin had notified all police that appellant should be considered armed and dangerous, he should contact an attorney and arrange a peaceful surrender. Appellant responded that he did wish to talk with an attorney before turning himself in. Appellant would not tell Redding his location, but the call was traced to the Paducah, Kentucky telephone exchange. The Kentucky State Police were notified of the call and were given a description of the car appellant was driving.

On the afternoon of February 6, a Kentucky State Policeman spotted appellant, arrested him, handcuffed him, advised him of his *Miranda* rights, placed him in his police car, and took him to the troop post in Mayfield, Kentucky. The post does not have jail facilities. It has a steel bar attached to a concrete wall, and high risk people are handcuffed to the bar while being processed. Appellant was considered high risk and accordingly was handcuffed to the bar. After only a short while, a detective came into the room, again advised appellant of his *Miranda* rights, and gave him a written statement of those rights. Appellant waived those rights in writing. All of this took place over a short time span, as appellant was arrested at 3:41 in the afternoon and signed the waiver about an hour and one-half later, at 5:23.

Appellant answered questions without hesitation during a lengthy interview that covers a total of forty-three transcribed pages. In the first thirty-five pages of the interview, appellant admitted that he had been in Harrison and had been drinking with the victim the last night of her life. He stated that he then stabbed her, but that he did so only in self-defense. He stated that he let her out of his car and had no idea of who might have later murdered her. At page thirty-six of the interview, and after appellant had given the above incriminating statement, the Kentucky detective asked appellant to give a more accurate statement of the whole affair. The detective said that appellant would later be questioned in Arkansas, and the officers in Arkansas would not be as friendly as they were because those officers would be from the area where the murder was committed. Appellant did not incriminate himself any further. Shortly after the comment about the officers in Arkansas, the detective said, "I can't make you say anything." The appellant responded: "Well, I understand that, and I don't want to be a smart ass and I don't want to appear to be one, and I don't want to be one, but in fifteen years in prison I'm not stupid when we're talking about things like this." An attorney was appointed to represent appellant in the extradition proceedings, and appellant waived extradition.

The public defender in Harrison learned that the police were looking for appellant and asked the circuit judge to appoint him as appellant's attorney. The circuit judge responded that he would do so in the event of appellant's apprehension. On February 7, the day after appellant had given the incriminating statement in

Kentucky, the public defender called the jail in Boone County and left a message that appellant was not to make a statement about the crime. A few minutes later, at 1:50 in the afternoon, the attorney called the jail in Kentucky and asked the jailer to instruct appellant not to give a statement. Immediately thereafter appellant called the attorney, and the attorney instructed him not to make a statement. Meanwhile, Captain Wolfe of the Boone County Sheriff's Office and Sergeant Bill Gage of the Arkansas State Police had arrived in Mayfield, Kentucky and had taken custody of appellant. In mid-afternoon on the 7th, the three of them started back to Boone County in a police car. They did not ask appellant any questions until they stopped in Dyersberg, Tennessee to get appellant some cigarettes. At that time, 4:11 on the afternoon of the 7th, appellant's *Miranda* rights were again read to him. There was no separate waiver of his rights, but the standard form used to advise appellant of his rights contains questions that imply a waiver. For example, appellant's right to an attorney was explained to him as follows:

"Do you understand that you have the right to talk to a lawyer for advice before we ask you any questions and to have him with you during questioning?" Appellant responded in writing, "Yes sir."

"Do you understand that if you cannot afford a lawyer, one will be appointed for you before any questioning if you wish, at no cost to you?" Appellant signed, "Yes sir."

"Do you understand that if you decide to answer questions now without a lawyer present, you still have the right to stop answering at any time? You also have the right to stop answering at any time until you talk to a lawyer?" Appellant signed, "Yes sir."

Appellant and the officers got back in the car to resume the journey to Boone County. Over the next hour or so appellant told the officers more about the murder. He said he and the victim had been drinking heavily, and she tried to kill him with a butcher knife. He said he took it away from her and stabbed her once in the back and twice in the front. He told the officers the location of the trash dumpster where he had disposed of the knife, the victim's purse, and part of her clothing. By 6:20 that afternoon, they had reached Paragould and stopped at a restaurant. There,

the officers again advised appellant of his *Miranda* rights. In doing so, they used the same form they had used earlier in the afternoon. Appellant signed a written statement that was a redaction of his earlier oral statement. They got to Harrison later that night, Friday the 7th, and appellant was placed in jail. On the following morning, February 8, Captain Wolfe gave appellant the same *Miranda* warnings, and appellant gave a lengthy and incriminating recorded interview. He was arraigned on Monday, February 10, and a lawyer was appointed to defend him.

About a month later, on March 4, appellant asked to speak to Captain Wolfe about a problem he was having in receiving his mail. After discussing the problem about the mail, appellant asked some questions about the murder and started to discuss the crime scene. Wolfe testified that he told appellant that he needed to wait until his attorney arrived before talking about the murder and that he did not want to violate appellant's rights. The jailer, Raymond Howe, confirmed that appellant initiated the conversation about the crime scene. Appellant then volunteered a further statement about the crime scene.

■ Appellant's points of appeal involve the Fifth and Sixth Amendments as well as the Arkansans Rules of Criminal Procedure. The arguments can be most clearly addressed by using the chronological order of the statements. The first statement was the one made to the detective in Kentucky. Appellant contends that this statement should have been suppressed because it was taken in violation of his Fifth Amendment rights. In order for a custodial statement to be admissible a defendant must have made a voluntary, knowing, and intelligent waiver of his *Miranda* rights. *Mauppin v. State*, 309 Ark. 235, 831 S.W.2d 104 (1992). The inquiry into the a waiver of those rights has two distinct components. *Id.* The first involves voluntariness. This component of the inquiry concerns whether appellant made a free choice, uncoerced by the police, to waive his rights. *Id.* The second component of the inquiry involves whether the defendant made the waiver knowingly and intelligently. *Id.*

■ Appellant first contends that the statement made in Kentucky was the product of police coercion. He argues that because he was handcuffed to a bar and because the police told him that a later interview in Arkansas would be conducted by less

friendly police, he was coerced into making the statement. The argument is wholly without merit. There was neither misconduct nor coercion by the Kentucky officers. The bulletin had informed them that the appellant was to be considered armed and dangerous. He had a prior conviction for escape and had convictions for crimes against persons. In fact, at that time he was on parole from the Nevada Department of Prisons as the result of a conviction for attempted murder. There was no lockup room at the post. The restraint was the result of appellant's prior crimes and was reasonable under the circumstances. It was not designed to create, nor should it have created the impression that something bad would happen if the appellant did not confess. The appellant had already made the incriminating part of the statement before the detective told appellant that the police in Kentucky would be friendlier than the police in Arkansas. Thus, the detective's statement could not have coerced appellant into making the statement. Appellant's later comment, that he had spent fifteen years in prison and knew that he did not have to say anything, is overwhelming proof of that fact.

██ Appellant next argues that the trial court erred in admitting the statement made in Kentucky because it violated his Fifth Amendment right to make only a knowing waiver. He contends that he did not understand the consequences of the waiver because the Kentucky officer did not explain the full range of penalties for the offense of capital murder in Arkansas. Appellant does not cite any cases, nor are we aware of any, that uphold his argument that at the time of making an incriminating statement, as distinguished from the time of making a guilty plea in court, a suspect must be advised of the exact range of penalties to which he might be subjected. Such a requirement would often present an impossible burden for the police. Often they do not know what formal charge will eventually be filed by the prosecutor, and most often they do not know what the suspect will say. Accordingly, they could not possibly advise a suspect of the exact range of penalties he will face. Even so, in this case, appellant clearly understood that he had been arrested on a charge of capital murder and that he was being asked to make a statement of fact about his involvement in the murder. He knew that it was serious crime and that he faced serious consequences. He had been arrested for, and convicted of, multiple crimes. He under-

stood the system and what he was doing. The trial court ruled that knowledge, taken together, was sufficient for appellant to clearly understand the consequences of the waiver. The ruling of the trial court was not clearly erroneous.

In reviewing the admissibility of incriminating statements, we make an independent determination based on the totality of the circumstances and reverse the trial court's ruling only if it was clearly erroneous. *Segerstrom v. State*, 301 Ark. 314, 783 S.W.2d 847 (1990). We have no hesitancy whatsoever in holding that the trial court's ruling on the motion to suppress this statement was not in error.

Appellant next contends that the trial court erred in its rulings on the admissibility of the statements taken on the return trip to Arkansas and in admitting the recorded statement taken by Captain Wolfe on the 8th. The first of these arguments is a Sixth Amendment argument. In it, appellant contends that, after an attorney was appointed for him in Kentucky, his Sixth Amendment right to advice by that counsel attached unless it was waived, and that he did not waive the right to counsel with that attorney. The argument is without merit. The attorney was appointed for the purpose of advising appellant on the extradition proceedings. The core purpose of the Sixth Amendment guarantee of counsel is to provide assistance to criminal defendants at trial and at all critical pretrial proceedings. *United States v. Gouveia*, 467 U.S. 180, 188 (1984). An extradition proceeding has only a "modest function," not involving the question of guilt or innocence, and is not a "criminal proceeding" within the meaning of the Sixth Amendment. *See Judd v. Vose*, 813 F.2d 494 (1st Cir. 1987) (and cases cited therein).

Appellant next makes a Fifth Amendment argument that these statements should have been suppressed. He contends that on the trip to Harrison the officers advised him of his *Miranda* rights, but failed to ask him if he waived those rights. He contends the same occurred the next day when he gave the recorded statement to Captain Wolfe. His contention is that he simply did not waive his rights, and it was the State's burden to show that he had so done. We have held that a confession may be obtained on the basis of an implied waiver of *Miranda* rights. *Ward v. State*, 308 Ark. 415, 827 S.W.2d 110, *cert. denied*, 113 S.

Ct. 124 (1992). In this case, the form used to advise appellant of his rights included questions which the appellant answered. The clear implication of the answers is that appellant waived the right to remain silent and waived the right to discuss matters with an attorney or have an attorney present.

However, it is not necessary for us to make our holding based solely upon an implied waiver, because there simply is no constitutional requirement that *Miranda* warnings be repeated each time a suspect is questioned. *Cope v. State*, 292 Ark. 391, 730 S.W.2d 242 (1987); *Wyrick v. Fields*, 459 U.S. 42 (1982). Obviously, if there is no constitutional requirement that a suspect be warned of his rights each time he is questioned, then there is no requirement that he waive those rights each time he is questioned. Here, the appellant was given adequate warning of his *Miranda* rights by the Kentucky detective on the afternoon of February 6. He waived those rights in writing at that time. Early the next afternoon a public defender, who eventually would be appointed to represent appellant, advised him not to make a statement. There were no other occurrences which might cause appellant to forget any of the warnings before the commencement of trip to Boone County in mid-afternoon. There is no reason that the warning and waiver by the Kentucky officers on the afternoon of the 6th was not, standing alone, sufficient warning and waiver for the statements made on the trip to Harrison on the 7th. The critical question is whether the accused understood the consequences of a decision to forego the aid of counsel. *Patterson v. Illinois*, 487 U.S. 285 (1988). The trial court did not err in ruling that the appellant understood the consequences.

The next day, February 8, Captain Wolfe gave appellant the same *Miranda* warnings as he gave on the 7th. Again, there was no express waiver. Appellant gave an incriminating statement that was recorded. He argues the trial court erred in refusing to suppress this statement because there was no waiver. Again, because of the short interval of time between the formal waiver in Kentucky and this statement and the lack of any extraordinary intervening occurrence, the prior waiver was sufficient. We cannot say that the trial court erred in ruling that appellant understood the consequences of foregoing counsel.

Appellant next argues that the trial court erred in

refusing to suppress the incriminating statement that he gave on March 4, which was after counsel had been appointed and after he had been arraigned. The trial court found that appellant initiated the conversation, volunteered the statement without any questioning, and, consequently, there was a waiver of appellant's Sixth Amendment right to counsel. *See Ward v. State*, 308 Ark. 415, 827 S.W.2d 110, *cert. denied*, 113 S. Ct. 124 (1992). The trial court's finding was based on the testimony of Captain Wolfe and jailer Howe. Appellant disputes that testimony. The issue was one of credibility, and it is in the province of the finder of fact to determine the credibility of witnesses. *Atkins v. State*, 310 Ark. 295, 836 S.W.2d 367 (1992). There was substantial evidence to support the findings of fact made by the trial court. Accordingly, we hold the trial court did not err in refusing to suppress the statement of March 4.

Appellant makes another constitutional argument involving both the Fifth and Sixth Amendment rights to counsel. In this argument appellant admits that a waiver of *Miranda* rights would constitute a waiver of Fifth Amendment rights, but contends that something more is required for a valid waiver of the Sixth Amendment right to counsel. For example, in *United States v. Mohabir*, 624 F.2d 1140 (2d Cir. 1980), the court stated that once the Sixth Amendment right to counsel attached, "a valid waiver . . . to have counsel present during post-indictment must be preceded by a federal judicial officer's explanation of the content and significance of this right." *Id*. at 1153. In *Duncan v. State*, 291 Ark. 521, 726 S.W.2d 653 (1987), we indicated that we might also require something more than a waiver of *Miranda* rights to constitute a waiver of Sixth Amendment Rights. However, those cases were decided before the Supreme Court of the United States determined whether a waiver of *Miranda* rights would constitute a waiver of both the Fifth and Sixth Amendment rights. In *Patterson v. Illinois*, 487 U.S. 285 (1988), the Court decided that issue and expressly held that "whatever warnings suffice for *Miranda's* purposes will also be sufficient in the context of postindictment [Sixth Amendment] questioning." *Id*. at 298. Consequently, in this case the *Miranda* warnings and the waiver of the *Miranda* rights was sufficient to waive appellant's Fifth as well as Sixth Amendment rights.

Appellant's final constitutional argument is that his

Sixth Amendment rights were violated when the police failed to follow his lawyer's instructions to not question him. The argument is without merit for a number of reasons. First, appellant had neither employed the attorney, nor had the attorney been appointed to represent him, at the time the attorney spoke to the jailer. The attorney simply did not represent appellant at the time he gave the instruction. Second, appellant had already made the statement to the Kentucky detective the day before the attorney made his call to Kentucky. Even so, the police told appellant of the call, and, in fact, appellant returned the attorney's call, and the attorney told him not to make any statements. Appellant subsequently chose to ignore counsel's advice. He now argues that the trial court erred in refusing to suppress the statement because the police failed to follow the attorney's instructions. It is not clear that the police failed to follow the attorney's instructions, but even if he were appellant's attorney and might have given instructions to the police which they failed to follow, we would not reverse on this point. The failure of police to follow counsel's instructions does not affect the validity of an otherwise valid waiver. *Mitchell v. State*, 306 Ark. 464, 816 S.W.2d 566 (1991); *Moran v. Burbine*, 475 U.S. 412 (1986).

■ Appellant's final argument involves Rule 8.1 of the Arkansas Rules of Criminal Procedure, which provides that an arrested person must be taken before a magistrate without unnecessary delay. Appellant was arrested in Kentucky on Thursday, February 6, and returned to Boone County on the night of Friday, the 7th. He was arraigned on February 10, the following Monday. In several cases we have held that a similar delay over the weekend was not unreasonable. *Johnson v. State*, 307 Ark. 525, 823 S.W.2d 440 (1992); *Owens v. State*, 300 Ark. 73, 777 S.W.2d 205 (1989); *Brown v. State*, 276 Ark. 20, 631 S.W.2d 829 (1982). Even if the delay might possibly be considered unreasonable, these statements would not be suppressed because there was no causal relationship between the giving of the statements and a delay in the first appearance. *Owens v. State*, 300 Ark. 73, 777 S.W.2d 205 (1989). Here, the first four custodial statements were not in any way related to a delay. Appellant made the first statement in Kentucky within three hours of his arrest. The next two statements were made the next day on the way back to Boone County, and appellant could not

have been taken before the local magistrate at that time. The fourth statement was given the next day. In short, the statements were given before there was any possibility that they were given as a result of an unreasonable delay.

Affirmed.