Michael CLAY *v.* STATE of Arkansas

CR 93-1262                                          883 S.W.2d 822

Supreme Court of Arkansas
Opinion delivered October 3, 1994
[Rehearing denied October 31, 1994.*]

*Hayes, Glaze, and Corbin, JJ., would grant rehearing.

*Terri L. Harris*, for appellant.

*Winston Bryant*, Att'y Gen., by: *Kent G. Holt*, Asst. Att'y Gen., for appellee.

DAVID NEWBERN, Justice. Michael Clay stands convicted of capital murder for which he was sentenced to life imprisonment without parole. He contends a confession he made to police authorities while he was incarcerated should have been suppressed and not admitted into evidence against him. We disagree with his argument that his waiver of his *Miranda* rights was not intelligently and knowingly executed and that his statement was involuntarily given. We must, however, reverse and remand the case because the statement should have been suppressed as it was given after an unnecessary delay, in violation of Ark. R. Crim. P. 8.1, between Mr. Clay's arrest and the time he was taken before a judicial officer. Mr. Clay raises an additional point for reversal in which we find no error. He claims evidence that he escaped from custody should not have been admitted. We discuss that point as well as the ones on waiver of rights and voluntariness of the confession for the benefit of the Trial Court upon retrial.

On August 14, 1990, the body of Glynda Wallace was found in an area alongside Macedonia Road in Gilmore. It was later determined that Ms. Wallace had died as the result of a gunshot wound. On August 20, 1990, the burned shell of Ms. Wallace's automobile was located in a rice field.

The Crittenden County Sheriff's Department received an anonymous tip that Michael Clay had been seen driving the victim's car. On Thursday, August 23, 1990, Mr. Clay was invited to the Sheriff's Department in Crittenden County for questioning concerning theft of the car. Mr. Clay initialed each of his *Miranda* rights on a form as they were read to him and signed the form at the bottom. He made an oral, exculpatory statement and was not detained.

Later in the evening on August 23, Mr. Clay was picked up and returned to the Sheriff's Department for questioning. He initialed and signed another rights form and subsequently made a tape recorded, rather convoluted statement in which he claimed he bought the victim's car from his uncle despite the fact that his uncle had no title to the car. Mr. Clay was arrested for theft by receiving. He escaped from custody on Friday, August 24.

On Saturday, August 25, Mr. Clay was rearrested. He again initialed and signed a rights form and was questioned further about his possession of the vehicle and the murder of Ms. Wallace. That afternoon he made another tape recorded statement in which he claimed that he was in the car with Ms. Wallace and his friend Robert Turner. He thought they were going to get a car but was surprised when Robert shot Ms. Wallace. He said Robert later gave him the car.

Mr. Clay was held in the Crittenden County jail and was questioned again on Sunday evening, August 26. He initialed and signed yet another rights form and gave another tape recorded statement in which he changed his story to say he had stopped to help Ms. Wallace change a flat tire and she had agreed to give him a ride to town. He said she declined to let him out of the car and was hitting him when his gun "went off," implying the shooting was accidental. He said he took her car, but that it was his friend Robert who burned the car. Mr. Clay was arrested for murder.

Officer Mickey Strayhorn, who along with Officer John Murray participated in the investigation, testified that on Monday, August 27, Mr. Clay took officers from the Sheriff's department where "things happened." On Tuesday, August 28, Mr. Clay was taken to Jonesboro for a polygraph examination where he gave a statement to Officer Charles Beall of the Arkansas State Police. In this statement, Mr. Clay confessed that he alone murdered Ms. Wallace and burned her car. Prior to signing the written version of the statement to Officer Beall on August 28, Mr. Clay initialed and signed another rights form.

At the outset of the trial, the Trial Court was informed the prosecution proposed to introduce the statements made by Mr. Clay, and a hearing was held outside the presence of the jury to determine their admissibility. Officer Murray testified that he did not know Mr. Clay's age (19 at that time) or that he had been a special education student at the high school where he had finished the 12th grade. He testified, as did Officer Strayhorn, that no coercive measures were used to obtain the statements or the written acknowledgments by Mr. Clay of his rights which Officer Murray said Mr. Clay "indicated he understood."

Officer Murray was asked about the delay in taking Mr. Clay

before a judicial officer. He testified that after Mr. Clay was rearrested on Saturday, August 25, he remained in custody the 26th, 27th, and 28th, the day he was taken to Jonesboro and on which he made the statement admitting he had killed Ms. Wallace to get her car. He remained in custody all day Wednesday the 29th and was taken to court that day. He said he normally would have taken a person arrested during a weekend for a "bond hearing" on the following Monday, which would have been August 27. He did not do so in this case because he said he "was instructed by Deputy Prosecutor James Hale to continue to the next court date for evidence involving this case."

Defense counsel moved to suppress the last two of the custodial statements made by Mr. Clay on the basis of their involuntariness and the fact that they were obtained due to an unnecessary delay in bringing Mr. Clay before a judicial officer after his arrest. The defense also moved in limine to prohibit the State from using as evidence Mr. Clay's August 23 escape from the Crittenden County jail.

### 1. Suppression of the statements

### a. Voluntariness and knowledge

Although it is not clear, parts of Mr. Clay's arguments lead us to conclude that he contends both that his waivers of the right to remain silent and to counsel were not voluntarily, knowingly, and intelligently given as well as that his statements were involuntary in the sense that they were coerced by force or promises. As we pointed out in *Mauppin* v. *State*, 309 Ark. 235, 831 S.W.2d 104 (1992), there are two separate issues regarding the waiver of *Miranda* rights:

> "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived." *Moran* v. *Burbine*, 475 U.S. 412 (1986) at 421 (citing *Fare* v. *Michael C.*, 442 U.S. 707, 725 (1979)). The "totality of the circumstances" appellate review mandates inquiry into an evaluation of "age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth

Amendment rights, and the consequences of waiving those rights." *Fare* at 725. Thus, a court must look at the totality of the circumstances to see if the State proved that a defendant had the requisite level of comprehension to waive his Fifth and Sixth Amendment rights.

Consideration of the validity of a criminal defendant's waiver of the right to remain silent and the right to counsel prior to giving an inculpatory statement may be divided into two components. *See Bryant* v. *State*, 314 Ark. 130, 862 S.W.2d 215 (1990). The first component is the voluntariness of the waiver, and it concerns whether the accused has made a free choice, uncoerced by the police, to waive his rights. We discussed that in the *Mauppin* case quoted above. The second component involves whether the defendant made the waiver knowingly and intelligently, and the inquiry then focuses on determining if the waiver, as we said in the *Mauppin* case, was made with "a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it."

In addition to the two aspects of the waiver issue, we must decide if the confession or inculpatory statement, given after a waiver of rights has occurred, was itself voluntarily made. As we use very similar standards to review both whether a waiver was valid and whether a subsequent statement was given voluntarily, we sometimes do not take the time to point out the distinction. But the distinction is there. See *Shaw* v. *State*, 299 Ark. 274, 773 S.W.2d 827 (1989), in which we discussed whether a waiver was knowingly, intelligently, and voluntarily made but declined to consider the voluntariness of the statement to which it applied because that issue was not raised at the trial.

In considering the totality of the circumstances surrounding both the rights waivers by Mr. Clay and his subsequent statements, we look to his age, education, and intelligence, the length of his detention, repeated or prolonged questioning, the use of mental or physical punishment, and the advice or lack of advice with respect to his constitutional rights. *Shaw* v. *State, supra.*

The circumstances in this case were these. As noted above, Mr. Clay was 19 years of age and had graduated from high school where he was enrolled in special education classes.

From the time he was first questioned on Thursday, August 23, until he gave the written statement to Officer Beall on Tuesday, August 28, he was interrogated six times. Except on August 23 when Mr. Clay was questioned, released, and then picked up and questioned again prior to being arrested for theft by receiving, he was interrogated just once a day each day he was in custody. There is no evidence that he was punished or threatened in any way on the days in question.

There is conflicting testimony concerning whether the interrogating officers adequately advised Mr. Clay of his constitutional rights. At the suppression hearing, Mr. Clay testified that he was told to sign the statement of rights form "if he did *not* understand his rights," and that his signature was needed in order to show the Sheriff that the officers had talked to him. On the other hand, Officers Murray and Strayhorn testified they read Clay his rights directly from the form, and that he initialed each right as it was read to him.

None of the questioning sessions were for extended periods of time, and there is no evidence Mr. Clay was deprived of food, sleep, or other necessities. The repeated interrogations were obviously due, in part, to the inconsistencies in the two statements given on Thursday, August 23, and the one given Saturday, August 25. Given the totality of the circumstances, we conclude there was no coercion used to obtain the statements.

Nor can we say the State failed to bear its burden of showing there was a voluntary, knowing, and intelligent waiver of rights. Mr. Clay's testimony that he signed the statement of rights forms because he was told his signature indicated only that the officers had talked to him or that he did not understand must be considered on the matter of waiver also, as must his testimony that one of the officers told him he (the officer) was a lawyer, implying that he was the lawyer to whom Mr. Clay was entitled. All of these allegations by Mr. Clay were denied by the officers.

The recorded colloquy between Mr. Clay and the officers who took his statements, which we have read in detail, reveals nothing which might have led the officers to conclude Mr. Clay was too slow or unintelligent to understand the rights which had been explained to him.

On August 28, when Mr. Clay gave his statement to Officer Beall of the Arkansas State Police, he made Officer Beall aware that he could not read or write well. The statement he executed ultimately inculpating himself to Officer Beall was written down by Officer Beall and signed by Mr. Clay. The Officer testified the words he wrote were those spoken by Mr. Clay after he had been informed of his rights. Again, there is nothing to show that the statement was coerced, and the State's evidence was sufficient to show that, despite Mr. Clay's age, and probable low I.Q., he was adequately informed of his rights and understood them.

### b. Delay and Rule 8.1

In nearly every case in which a criminal defendant has sought suppression of a confession or other inculpatory statement given to police officers while in custody we are confronted with conflicting testimony, sometimes called a "swearing match," with the defendant saying he or she was coerced or did not understand and the police saying there was no coercion and an appearance, at least, of understanding on the part of the defendant. As we pointed out in *Duncan* v. *State*, 291 Ark. 521, 726 S.W.2d 653 (1987), citing W. LaFave, *Criminal Procedure § 6.3* (1984), the reason for a rule requiring the authorities to assure a prompt appearance before a judge of a person under arrest is that the other safeguards, *i.e.*, the voluntariness and knowing and intelligence determinations, can be illusory. We quote the following again:

> Since "the use of the third-degree tactics is . . . difficult to prove because there is always the word of the police against the word of the accused; and the prestige of police testimony usually carries the day," the safeguards upon which the traditional confessions rules rest have aptly been called "illusory." The main thrust of the *McNabb-Mallory* rule [*McNabb* v. *United States*, 318 U.S. 332 (1943); *Mallory* v. *United States*, 354 U.S. 449 (1957)] . . . is to bypass conflicts over the nature of the secret interrogation and to minimize both the "temptation" and the "opportunity" to obtain coerced confessions. Id. at 455, citing, Y. Kamisar, Police Interrogation and Confessions (1980).

■    The rule we have adopted to provide minimal protection to persons arrested and subjected to interrogation is Rule 8.1 of the Arkansas Rules of Criminal Procedure. It provides: "An arrested person who is not released by citation or by other lawful manner shall be taken before a judicial officer without unnecessary delay."

The *Duncan* case gave us an opportunity not only to discuss the reason for the rule but to indicate to police and prosecutors how we would apply it. We adopted a three-part test. The delay must have been unnecessary, the evidence must be prejudicial, and the evidence must be reasonably related to the delay.

### i. Unnecessary

The delay in taking Mr. Clay before a judge was unnecessary. There is no question but that he could have been presented on Monday, August 27. The only reason that did not occur was the order of the deputy prosecutor to "continue to the next court date for evidence involving this case." The State presented nothing to show that Mr. Clay could not have been taken before a judge on Monday, August 27.

■■  In *County of Riverside* v. *McLaughlin*, 500 U.S. 44 (1991), the United States Supreme Court dealt with the Fourth Amendment requirement of a probable cause hearing to be held for a person arrested without a warrant. It held that if such a hearing does not occur within 48 hours, the burden shifts to the government to show the existence of a good faith emergency or other extraordinary circumstances. In the course of discussing that matter which is very similar to the one presented here, the Supreme Court said: "Examples of unreasonable delay are delays for the purpose of gathering additional evidence to justify the arrest, a delay motivated by ill will against the arrested individual or delay for delay's sake."

In the *Duncan* case, one of the reasons given for reversal was, "The record shows the delay was purposeful and that the prosecutor made a deliberate decision to hold Duncan in detention and ignore the prompt appearance requirement." The delay in the case now before us was not only unnecessary, it was apparently of the same deliberate sort as we encountered in the *Duncan* case which should not be countenanced.

## ii. Prejudicial

In the statement Mr. Clay gave on Sunday, August 26, he alleged his gun "went off" while he was struggling with Ms. Wallace. That was a very prejudicial statement, but it was given prior to the unnecessary delay in taking him before a judicial officer. We have considered whether his subsequent statement might have been harmless error, and thus not prejudicial, in view of the earlier statement. It was not harmless error. In the statement given on August 28, unlike the one given on August 26, Mr. Clay admitted all the elements of the offense with which he ultimately was charged, that is, a homicide committed during the course of a robbery. Ark. Code Ann. § 5-10-101(a)(1) (Repl. 1993). The statement could not have been more prejudicial.

## iii. Related to delay

We can see no relationship between the statement given by Mr. Clay on August 26 and the subsequent delay in taking him before a judge. That statement may be used against him upon retrial. The August 28 statement is, however, a different matter.

It is clear that each time Mr. Clay gave a statement to authorities after his initial ones of August 23 he took a step further toward implicating himself in the murder of Ms. Wallace. The statement of the deputy prosecutor, as reported by Officer Murray, that he should delay taking Mr. Clay before a judicial officer "for evidence involving this case," makes it appear that the delay was ordered with the expectation that Mr. Clay would do what he ultimately did, *i.e.*, admit to capital murder.

Short of that, however, we can say with assurance that, if Mr. Clay had been taken before a judicial officer on August 27, the judicial officer would have followed Ark. R. Crim. P. 8.2 which requires the judge to assure that an accused has counsel appointed if he cannot afford one and does not choose to waive the right to counsel to defend him. Had counsel been appointed, it is most unlikely the statement made on August 28 would have been forthcoming.

The facts of the *Duncan* case were, no doubt, far more egregious than the ones now before us. Duncan was held "incom-

municado" for three days. He was undoubtedly verbally, at least, abused by officers. He asked "do y'all appoint lawyers," but the interrogation continued. He was interrogated for long periods of time. In short, there was evidence that he was subjected to what Professors LaFave and Kamisar would call the "third degree." All of that evidence, however, went more to the issue of the voluntariness of the statement Duncan ultimately gave than to the effect of the delay. We said:

> The State urges the confession was voluntary under the totality of the circumstances, but we do not regard that approach as appropriate in seeking a reasonable and fair resolution of the application of this rule. As we have said, assurance of voluntariness is not the only concern. Of equal importance is the mechanism of the first appearance that guarantees that the accused's constitutional rights will be protected and implemented. "Indeed, [the rights afforded under Rule 8.1] are basic and fundamental rights which our state and federal constitutions secure to every arrestee." *Bolden* v. *State*, 262 Ark. 718, 561 S.W.2d 281 (1978). Furthermore, if exclusion under the rule rests on a voluntariness standard, we are again faced with a swearing-match the rule was designed to avoid.

The three and one-half day period Mr. Duncan was held prior to being taken before a judicial officer was, in duration, similar to the period between Saturday, August 25, and Wednesday, August 29, in this case. When we realize that the point of the *Duncan* case was not the fact that Duncan was subjected to abuse, but that much of what happened to him, including his self-inculpation, would not have occurred had he been taken before a judicial officer without unnecessary delay, we have no difficulty reaching the same conclusion here as we reached there. The statement given by Mr. Clay on Tuesday, August 28, 1990, was related to the violation of Rule 8.1.

As the delay was unnecessary, the evidence was prejudicial, and the obtaining of it was related to the delay, it was reversible error not to exclude the August 28 statement.

### 2. Evidence of escape

Mr. Clay contends that testimony concerning his escape

from the county jail on August 23, 1990, should have been excluded. He asserts that the testimony had no independent relevance and did not meet the probative value versus unfair prejudice balancing test of Rule 403 of the Arkansas Rules of Evidence. The argument has no merit.

A ruling on the relevancy of the evidence is discretionary and will not be reversed unless the Trial Court abused its discretion. *Walker* v. *State*, 301 Ark. 218, 783 S.W.2d 44 (1990). The Trial Court also has discretion in determining the relevance of evidence and in gauging its probative value against unfair prejudice. *Gunter* v. *State*, 313 Ark. 504, 857 S.W.2d 156 (1993), *cert. denied*, 62 USLW 3319 (1993).

At the trial, there was testimony that Mr. Clay escaped after being charged with theft by receiving on August 23. Although his argument is unclear, Mr. Clay seems to assert that the testimony lacks probative value concerning the murder charge because at the time of his flight from jail, he was only charged with theft by receiving. The State argues that the theft by receiving charge was linked to the murder charge. An escape from incarceration is admissible as circumstantial evidence of guilt. *Centeno* v. *State*, 260 Ark. 17, 537 S.W.2d 368 (1976). We agree the jury should have no difficulty in weighing the circumstantial inference as to Mr. Clay's state of mind with respect to the relationship of the escape to the two separate offenses. The escape evidence was properly received.

Reversed and remanded.

HAYS, GLAZE, and CORBIN, JJ., dissent.

TOM GLAZE, Justice, dissenting. In my view, the majority opinion is wrong. The record clearly reflects that Clay, himself, initially delayed his arraignment by escaping from jail. And *within twenty-four hours* after he was found and rearrested, Clay admitted that he had shot Glynda Wallace, and had given and shown the authorities enough evidence needed to convict him of capital murder. In other words, even if Clay had been arraigned within a forty-eight hour period, he had already knowingly and voluntarily given police all the probable cause they needed not only to arrest and charge him but to convict him, as well. Nonetheless, the majority court needlessly reverses this case based upon

a confession which does no more than confirm the evidence the police already had. From the state's view, the only purpose Clay's final confession served was his concession that no one had assisted him in killing Glynda Wallace.

First, I note the trial court's following findings when it ruled that all of Clay's statements were admissible:

> [T]his was not a case of a continuous tag team interviewing through the day and night until finally he broke and made an admission. I assume the end results there must be something inculpatory here, I assume. But the defendant was not in any way abused, mistreated, no force or coercion, threats or intimidation either upon the defendant or members of his family was used in these interviews even though they were over several . . . days were not unduly prolonged or long in nature.

The record thoroughly supports the trial court's findings. The chronology of events follows:

> Tues., Aug. 14, 1990 – The victim, Glynda Wallace, was found dead.
>
> Thurs., Aug. 23, 1990, at 1:10 p.m. – Clay was interviewed and released.
>
> Thurs., Aug. 23, 1990, at 7:20 p.m. – Clay was arrested for theft by receiving of victim's car. Clay gave statement his Uncle Andrew sold him Glynda's car and Andrew purportedly said that Robert Turner had title.
>
> Fri., Aug. 24, 1990 – Clay escapes from jail.
>
> Sat., Aug. 25, 1990 – Clay is found, rearrested and gives statement at 3:10 p.m., implicating a Robert Turner who Clay said stole Glynda's car and shot her. He acknowledged his presence at crime scene.
>
> Sun., Aug. 26, 1990, at 5:10 p.m. – State charged Clay with capital murder after he gave statement admitting he had asked Glynda Wallace for a ride, she had refused, so Clay pulled a gun; she gave him a ride and when he departed the car, his gun went off. He mentioned Robert Turner appeared, came to the car and

kicked Wallace down gravel road. He said he did not know who burned Glynda's car.

Mon., Aug. 27, 1990 – Clay takes authorities to site where car had been burned and purse found.

Tues., Aug. 28, 1990, at 10:20 a.m. – Clay gives statement relating that he shot Glynda Wallace and no one else was involved. He stated where he took Glynda's car to burn it and where he threw away his gun.

From the foregoing events, it is clear Clay initially caused the delay in his arraignment. His escape from jail prevented the state from having him arraigned until after his recapture on Saturday, August 25, 1990. On this date, he gave a second voluntary, but different, account bearing on his involvement with Glynda's vehicle and death. The next day, Sunday, he gave a third account, but this time he admitted he shot Glynda Wallace.

A fair reading of the record shows that Clay's August 26th or 28th statements (and earlier statements) were not causally related to any delay in his arraignment or that the police actions contributed to that delay.

In *Duncan* v. *State,* 291 Ark. 521, 726 S.W.2d 653 (1987), we adopted the rule that a defendant's confession should *not* automatically be excluded from evidence unless that confession was related to the delay. Specifically, the *Duncan* court adopted a three-part test that (1) the delay must be unnecessary, (2) the evidence must be prejudicial, and (3) *the evidence must be reasonably related to the delay.* (My emphasis). In *Duncan,* this court held a causal connection existed because the defendant initially gave only exculpatory statements, but after police held him three and a half days in incommunicado detention, he incriminated himself. Also, Duncan was mildly retarded, had asked authorities if they appointed lawyers to which the officers made no response, and no evidence showed Duncan had signed a waiver of rights form.

This case is a far cry from *Duncan.* From the beginning, it is undisputed that ample proof existed tying Clay to the theft by receiving of Glynda Wallace's car; but he escaped, thereby preventing any arraignment on Friday — the day after his arrest for

theft. When Clay was rearrested on Saturday, he immediately implicated Robert Turner as the one who shot Glynda, but also implicated himself, as well, by acknowledging his presence at the crime. By Sunday, the next day, Clay admitted that he had seen Glynda, pulled a gun on her and subsequently shot her.

From the time Clay was rearrested and in custody on Saturday, he was signing rights forms and telling stories that implicated himself, in varying degrees, with Glynda's murder. Unlike in *Duncan,* the record here shows Clay's escape and numerous voluntary statements served to show his involvement and guilt in Glynda's murder. Clay's final statement, given on Tuesday, August 28th, merely confirmed his earlier Sunday statement by conceding his having shot Glynda. His final August 28th statement merely disclosed he acted alone — a fact that the police had already determined by other independent investigation.

Today, the majority opinion effectively adopts the *automatic rule* that, if a defendant is not arraigned within forty-eight hours from his arrest, no statements given by the defendant during that period can be admitted at trial. That is not Arkansas law. Nor is it required under the Supreme Court decision in *County of Riverside* v. *McLaughlin,* 500 U.S. 44 (1991), which our court followed in *Duncan.* Again, even if Clay had been arraigned within forty-eight hours after his rearrest (which would have expired sometime Monday, August 27th), Clay had already voluntarily given authorities probable cause, and more, to hold, charge and convict him of Glynda's murder. In short, Clay's August 28th confession was not related to the short delay in his arraignment. His confession, instead, naturally evolved from his own actions and prior statements. At the least, even if it is said that Clay's confession resulted from the brief delay in Clay's arraignment, the trial court's admission of the August 28th confession was harmless in view of the overwhelming evidence of his guilt. This court should uphold the trial court's ruling that admitted all of Clay's statements into evidence, and affirm Clay's murder conviction.

HAYS and CORBIN, JJ., join this dissent.